CLAYTON *v.* CLAYTON.

1. DIVORCE—WITHDRAWAL OF ATTORNEY.

   Withdrawal of attorney for defendant wife in suit for divorce did not prejudice her case where trial judge with eminent fairness amply took care of her rights and gave her a full opportunity to present her case.

2. SAME—CREDIBILITY OF WIFE.

   Rejection of testimony of defendant wife in divorce suit as unworthy of belief *held,* justified under record presented.

3. SAME—EXTREME CRUELTY—EVIDENCE.

   In husband's suit for divorce, evidence supported decree for plaintiff on the ground of extreme cruelty.

4. SAME—APPEAL AND ERROR—DISMISSAL OF BILL—DIVISION OF PROPERTY.

   In husband's suit for divorce wherein defendant wife appealed and simply sought reversal of decree for plaintiff on ground of extreme cruelty and dismissal of bill, the correctness and justice of the decree as to division of property is not a point in issue.

Appeal from Wayne; Jayne (Ira W.), J. Submitted June 12, 1945. (Docket No. 10, Calendar No. 43,026.) Decided December 3, 1945.

Bill by Paul M. Clayton against Etta Clayton for an annulment and divorce. Decree of divorce granted. Defendant appeals. Affirmed.

*William O'Neill Kronner* (*G. Leslie Field,* of counsel), for plaintiff.

*William J. Eggenberger,* for defendant.

REID, J. This is a suit for divorce. From a decree for plaintiff, defendant appeals.

On April 11, 1942, plaintiff filed a bill of complaint, count 1 of which prayed for an annulment on the ground that the defendant wife was insane at the time of the marriage, and count 2, for a divorce on the grounds of cruelty. Defendant filed an answer denying the material allegations, and praying for no relief except dismissal of the bill. On June 5, 1943, pursuant to stipulation and court order, plaintiff filed an amended and supplemental bill of complaint for divorce, alleging chiefly acts of gross immorality on the part of defendant occurring subsequent to the separation of the parties and the filing of the original bill of complaint, and omitting the charge of insanity and prayer for annulment. Defendant filed an answer to this latter bill on June 17, 1943, denying the charges made but again asking no relief other than dismissal of the bill.

Proofs were heard in the lower court from July 8 to July 13, 1943, at which time the matter was adjourned to October 12, 1943, for taking medical testimony. However, the adjourned hearing was not held until June 7, 1944, and because of defendant's objection to the medical testimony on the ground of privilege, the testimony taken at that time was excluded and the proofs closed. On September 27, 1944, after reviewing a transcript of the proceedings, the trial judge filed his opinion, in which he dismissed count 1 for annulment and granted plaintiff a decree of divorce on the ground of cruelty, finding that defendant's conduct with other men was such as to constitute extreme cruelty to a husband of plaintiff's character and sensitiveness. The decree was signed October 9, 1944, granting plaintiff a decree of divorce and making disposition of the small home of the parties.

Plaintiff and defendant were married October 29, 1940, and separated December 15, 1941, though they lived together only three months, and as husband and wife for only about three weeks. There were no children. Defendant had been previously married and divorced; this was plaintiff's first marriage. Plaintiff is a graduate engineer doing research work on Diesel engines at General Motors Corporation, and earns a substantial salary. Prior to the marriage defendant was employed as a waitress, salesgirl and part-time hostess, and at the time of her marriage was 29 years old.

In 1939 defendant underwent three operations: hysterectomy (removal of uterus); oöphorectomy (removal of ovaries); and appendectomy (removal of appendix). Defendant also testified to having had a rectal operation about seven years before the trial. A month prior to the present marriage, defendant had a complete physical and mental checkup and during a portion of the time it took to complete the examination she was confined to Grace hospital in Detroit. She advised the doctor in charge of her case of the fact that she wanted to get married. She was discharged from the hospital as being in good condition September 24, 1940, and the neurologist's report was negative. On June 22 or 23, 1943, about two weeks before the trial, defendant was again examined by a physician and her mental condition was described as normal.

Plaintiff went with defendant quite a considerable time before he married her, calling on her at her residence nearly every night for a period of several months. Some time after plaintiff had proposed marriage and been accepted by the defendant, defendant finally told him that she was then married, but that she had not lived with her husband for several years and that she was going to obtain a di-

vorce immediately, and even after being thus informed that she was already married and not divorced plaintiff continued his courtship.

After the marriage, defendant complained of various illnesses and plaintiff engaged at least 10 doctors, all of whom were specialists, for defendant. Defendant was also examined at the neuropsychiatric department of the Ann Arbor hospital by Dr. Patterson, but he made no recommendation to plaintiff following the examination. None of the doctors who examined defendant reported to plaintiff any finding of physical disability. Defendant, besides spending some time at the hospital at Ann Arbor and at Henry Ford hospital, was also confined at various times between the marriage and separation of the parties in two sanitariums and one convalescent home, at a total cost to plaintiff for hospital and doctors' charges of between $2,000 and $3,000.

Plaintiff testified that before his marriage to defendant, she was always very immaculate and always very much a lady, and always dressed neatly, but that she changed "within a few minutes after the marriage." Plaintiff further testified,

"After we were married, she was never dressed properly that I can remember of. Her hair was uncombed. She would go around with old worn-out shoes when she had much better shoes to wear, and her dress was worn without belts, socks hanging loose around her ankles. When I went out to visit our friends, I argued and did everything to get her to dress so I could be proud of her appearance, but the best description of how she would dress would be she would dress slack. * * * She would send me back home to get some different shoes or a belt to her dress, or some other items she had forgotten

to bring with her, or she wanted to have while she was at the party, I was always at her beck and call and I would do that.''

Plaintiff explains the separation as follows:

''I did not separate from my wife at all except the final separation, unless it was a case for her being sent to a hospital or unable to live with me.''

Plaintiff further testified that defendant failed to do the housework and laundry, forcing him to perform those tasks after work; that defendant feigned illness continually to force him to wait upon her; that defendant became extremely filthy in her personal habits; that she consorted with other men; that she was jealous and without any justification accused him of acts of immorality with another woman; that she circulated slanderous and untrue stories about him; that his health broke down as a result of defendant's acts, and that there was no possibility of reconciliation. Plaintiff was corroborated in his testimony on some important points by several witnesses.

Defendant denied these charges and was supported in her denials by her brother, her mother, her sister-in-law, the husband of a first cousin, and Valetta Fudge.

Defendant admits that there is no doubt that she has been ill more than the normal person, and that she received considerable medical and hospital attention at great expense, but claims that these things do not justify plaintiff's conduct; that instead of plaintiff adjusting himself to these conditions which he was well aware of and could have anticipated before his marriage, he pursued a course of conduct which was most cruel. Defendant claims that plaintiff was making a good salary, $400 per month, and

that instead of making any serious attempts to establish a home, which he could well afford, he schemed to have defendant confined in hospitals and institutions against her wishes, except at the University of Michigan hospital, and that at one time he lived with friends while he had defendant live in a downtown hotel. Defendant claims this attitude and course of conduct caused great expense and finally led to a separation after plaintiff acquired a home in Berkley. Defendant further claims that when plaintiff left her, he simply hired his mother-in-law to take care of defendant and left.

On cross-examination defendant testified as follows:

"*Q.* Was there any time in the last year or year and a half, or since you lived on Thomas street in Berkley that any man ever spent the entire night at your house when you were the only other occupant?

"*A.* You mean did any man ever spend the night at my house while I was there alone?

"*Q.* That's right?

"*A.* No, sir.

"*Q.* That never happened?

"*A.* That has never happened as God is my witness."

Plaintiff's rebuttal witness, John Cherwalk, however, testified as follows:

"I have stayed there all night alone with her during the last year, at least ten times, and could have been more. I have been there and it is not true that she never saw or entertained any man at any time at night, and as to whether she made any improper advances to me when she came into my bedroom depends upon how you interpret that, perhaps you might call them that. She has sat on the bed while I was in bed and while she was dressed in her nightgown."

Upon the completion of Cherwalk's testimony, the court directed the defendant to take the stand and examined her as follows:

"*Q.* Do you know him? (referring to Cherwalk)
"*A.* I have seen him.
"*Q.* Did he ever stay all night in your house?
"*A.* He has.
"*Q.* That is all.
"*A.* Not with me though."

Defendant claims that upon this testimony on her part having been given, the court's ruling indicated the disfavor in which he held the defendant and regarded her testimony. However, it is clear that the court granted defendant further time to produce testimony and upon the adjourned hearing much later than the time appointed and over a year from the time of the giving of the testimony last above quoted, the court again took up the hearing and the parties were present represented by their counsel. Mr. Piggins then requested approval of the court of his withdrawal from the case. Defendant now claims that this action of Mr. Piggins was necessitated because of the attitude of the court and resulted in her being put to a disadvantage. We find that the rulings by the court with eminent fairness amply took care of the defendant's rights and gave her a full opportunity to present her case.

Defendant complains that the trial judge rejected her testimony as unworthy of belief. In that, the trial judge was justified.

We find the facts to be substantially as claimed by plaintiff. The trial court correctly found the defendant guilty of the cruelty charged in the bill of complaint.

The correctness and justice of the decree as to division of property is not a point in issue. Defendant simply requests that the decree be reversed and the bill dismissed. The decree for plaintiff is affirmed, with costs to plaintiff.

Starr, C. J., and North, Butzel, Bushnell, Sharpe, and Boyles, JJ., concurred.

The late Justice Wiest took no part in the decision of this case.